May it please the court. I'm Matthew Kenning. I'm representing the petitioner Freeman. In this case, I'd like to reserve two minutes for rebuttal. You have to watch the clock yourself, sir. Thank you. The issue in this case is simply whether the country report in the record contains substantial evidence rebutting the presumption that the specific harm that my client suffered and fears will recur in the future will in fact recur if he's going to return to Liberia. And it's settled law that the showing that or the analysis by which it's shown that the presumption is rebutted has to be an individualized analysis that addresses the specific harms and the specific fears that my client expressed in his testimony. The country conditions set forth that Charles Taylor's thugs have now signed a peace accord with the country of Liberia and that they have entered into some sort of a modus vivendi where they are now parts of the government. If they if that is so, why doesn't that take care of your client's preoccupation as being a member of the crude tribe and the son of a former diplomat? It's true that the country reports would address the fear that my client would be persecuted as a member of the crude tribe or as a member of the Koran tribe, which is his mother's tribe. However, that's not the specific fear that my client articulated in his testimony. His fear was that as a consequence of the abuse he suffered because of his ethnicity, he then allied himself with the Nigerian army, which were in the country as peacekeepers. And as part of that relationship with the Nigerian army, he identified members of Taylor's rebel army, as well as translating for him. And he testified that they then regarded him as a traitor and shot at him. And the country reports don't address his fear that he will be subject to that kind of retaliation if he returns to Liberia because it's a personal vendetta, if you will, against him, based on what the now former Taylor soldiers regarded as treasonous behavior or un-Liberian behavior. And in exhibit two, which was referred to by the BIA, there is additional material, press reports saying different things. One says that the former Taylor people have been quieted and others checkmated. And others say that they haven't been checkmated. What's your view on that? Well, I think that because the burden of proof is on the government, ambiguous or conflicting evidence should be resolved in favor of my client. You know, the case law, I think, is clear that an ambiguous report will not be sufficient to rebuke retaliation. I think it's probably true that if my client bore the burden of proof, then the record would go against him. But the purpose of this presumption is to err on the side of caution in a case where an applicant has shown that he's been harmed in the past. Just a question of curiosity, where is Mr. Freeman now? He's in California. And you're from Champaign, Illinois? That's correct. How does that occur? Well, I had been in the habit of, not in the habit, but I had several times taken on pro bono immigration appeals. And in this instance, I contacted the Florence Project. And Ms. Kingsnorth, the pro bono coordinator, put me on to Mr. Freeman's case. Okay. Thank you. So I'd just like to briefly summarize my argument in the brief that the general statements that are contained in the country report and elsewhere in the record about political improvements in Liberia, the fact that the civil war is over and has been over for quite some time, are not evidence that rebuts the specific fear that my client articulated in his testimony. And that is, again, the fear that I just explained, the fear of retaliation based on what he did as a collaborator with the Nigerian army. That particularized fear would be very difficult to be the subject of any newspaper or country condition, wouldn't it? That's true. So what you're saying is that once he's proved persecution and the presumption of persecution lasts, simply showing country conditions or press reports of general conditions will never be sufficiently particularized. Yes, I think that's true. Thank you. Counsel, are you still arguing, Judge O'Scanlan here, are you still arguing ethnicity or are you arguing ethnicity and his prior contacts with the Nigerian army? I'm arguing ethnicity and his prior contacts with the Nigerian army. And I would like to stress that the persecution based on his contacts with the Nigerian army is a direct result of the persecution because of his ethnicity. He testified that he was displaced by the war. He fell into the hands of Taylor's rebels who abused him because of his ethnicity, or the immigration judge so found. And then when he managed to escape, he needed protection, and that was why he chose to serve the Nigerian army in the way that he said he did. So I realize that taken by itself, the collaboration with the Nigerian army would have to fall under a different protected ground. It wouldn't be persecution because of ethnicity. But in this case, it's persecution that's an immediate and direct consequence of the persecution on account of ethnicity that the immigration judge found that he suffered. Counsel, to what extent does his distinct manner of speaking play into the case? Well, it caused or contributed to the persecution that he initially suffered, or so he testified. I think that's logical. He also said that his ‑‑ Before you leave that, is it logical why? Is the idea that it makes him more readily identifiable? Correct. It marked him out as an outsider or a foreigner because he didn't speak like a typical ‑‑ or he doesn't speak like a typical Liberian. It's also part of the reason why he was useful to the Nigerian army because he was able to trans‑‑ apparently there's difficulty for speakers of Nigerian English to understand speakers of Liberian English, and he was able to mediate that. So part of it is that he was a translator, and what I'm understanding is this other part of your brief is that he was basically raised abroad, and so his accent is different and more readily identifiable. Correct. And he testified that he doesn't speak his native dialect. I don't think there was evidence as to whether he means not at all or not well, but he said he doesn't speak it. Thank you. I see that my initial time is up here. Okay. Thank you. Good morning again, Your Honors. May it please the Court. Edith Yacon on behalf of the Respondent and Attorney General. I think my time might be well spent this morning to discuss the burden of proof for withholding of removal and the burden shifting scheme in the statute and regulations. The regulations do provide that if an alien demonstrated past persecution, it shall be presumed that he has a clear probability of future persecution on account of the original claim. As Your Honors know, asylum requires a well-founded fear of future persecution, a lower standard than withholding of removal, which is the only application in this case. Withholding requires a clear probability. Now, the burden shifting scheme allows the Department of Homeland Security to rebut the presumption that results from a finding of past persecution. If the DHS demonstrates that there's been, amongst other things, a fundamental change in circumstances, such that the applicant's life or freedom would not be threatened on account of the protected ground. Well, Counsel, do I understand correctly that the BIA in this case corrected the IJ's finding with respect to that particular point? Yes. With respect to the burden shifting scheme, what the board said was we find no clear error in the undisputed findings of fact of the immigration judge, and although the immigration judge appeared to place the burden on the petitioner to demonstrate a well-founded fear of a clear probability in this case because it was withholding, DHS met its burden based on these undisputed findings of fact made by the immigration judge in this case. So what about the past persecution? The past persecution was found by the IJ to be based on ethnicity and petitioner didn't challenge that finding on appeal to the board. And, in fact, in his petition for review and opening brief, he doesn't challenge the nexus finding that the past persecution was on account of ethnicity. And so based on this burden shifting scheme, there's a presumption that he will be persecuted in the future on account of his ethnicity, but not on other accounts, which he may have argued he has a fear of persecution on account of, but didn't suffer past persecution on account of. So you can see that he is presumed with respect to the ethnicity claim. That's correct. He was presumed on account of ethnicity, and then DHS rebutted that with the presentation of the country conditions report, which the IJ and the board agreed was sufficient to find changed circumstances in Liberia, such that he no longer has a clear probability of persecution on account of his ethnicity. Counsel, one more question. Sure. With respect to the country report, please help me understand where it was individualized or where the IJ did an individualized application to the petitioner in this case. In this case, the petitioner indicated that his persecution arose when Charles Taylor's rebels came and lined him and his family members up and asked what ethnicity they were. There was some confusion, and subsequently he was taken to a rebel camp. Of course, the Civil War had a lot of ethnic tinges to it, and in this case, the immigration judge and the board noted that, first of all, the Civil War had ended. Second of all, Charles Taylor, who was the leader of these rebel forces which were causing the persecution, which was reigned upon petitioner and his family, was no longer in power. And more importantly, although ethnic tensions continued to exist in the country, the country conditions report didn't evidence any violence resulting from that tension. And so for that reason, where he was previously harmed by Charles Taylor's rebels and Charles Taylor is no longer in power and there's no evidence to show that any violence resulted from continuing ethnic tension, the agency was rationally construing an ambiguous or somewhat contradictory country conditions report. What about the country reports mentioned that Charles Taylor's, the folks who were aligned with Charles Taylor, they have largely been incorporated into positions in the military and in the police? Well, this wasn't something that was discussed by the agency, but most certainly that subsumed in the concept of some peace accord and a conclusion to the Civil War, two Civil Wars, which had wrecked Liberia in the 80s, 90s, and so on. And so the immigration judge and the board did take note of the significant political changes which occurred in the country, but noted that there were also ethnic consequences in the sense that although ethnic tensions continued to exist in the country, there was no evidence of violence which resulted from that tension. And so for this reason, it was individualized. He'd been harmed by Charles Taylor. Charles Taylor is no longer in power. The issue was — I'm sorry, go ahead. Oh, no, please. Well, I've asked the question, and I think you've given me the best answer that you've got about the extent to which the Taylor forces still remain in positions of power, so forgive me. Go right ahead. Well, when the question was whether ethnic tension might be the cause for future persecution, the petitioner concedes the argument today that the country reports thereabout the presumption of future persecution on account of ethnicity. Instead, he presents a claim based on his assistance to Nigerian forces when he returned from the rebel camp. Now, the record indicates that he was an interpreter for the Nigerians and that they were shot upon, but the Nigerians were the ones who helped him escape from Liberia, and in fact there was no finding that he was persecuted in the past on account of his assistance to the Nigerians, and therefore there's no presumption that he'll be persecuted in the future. Wait a minute. It seems a little contradictory. His Nigerian forces helped him because he had to escape from Liberia. Isn't that a pretty clear indication he's being persecuted? He remained with the Nigerian forces for quite a while, and then after he assisted them in their task, then they assisted him to depart the country, as many people in his position would want to do, of course. Many people who have helped the Nigerians, especially crew tribe people. But the point is that there was no finding of past persecution on account of his assistance to the Nigerians. Therefore, there's no presumption that he'll be persecuted in the future. So you separate the two. You don't take Mr. Keating's point that the assistance to the Nigerians was a sort of a follow-on from his ethnicity. The idea behind his fear of future persecution on account of assistance to the Nigerians is that individuals who previously were linked to the rebel forces might see him as a turncoat or somebody who was an informer. But he was an informer, right? That's the whole point, isn't it? But there was no finding by the agency. The agency simply concluded that he suffered past persecution on account of ethnicity. And should he have wanted to challenge that nexus finding, he could have done so before the agency and said, well, that's not all. I appreciate that, counsel, but I'm not sure that you're answering Judge Zea's question, which is can you put a finer point on this for me? How is it that you're able, under the circumstances of this case, how is it that you're able to draw such a clean line and divorce these two? Well, it's more an issue of exhaustion because if Petitioner sought the challenge of finding that ethnicity was the ground, he could have done so before the board. He could have done so in a motion to reopen and so on. But in this case, the finding of the agency was that ethnicity was the ground and based on the harm that he suffered in the rebel camp and so on. And what happened afterwards, well, there was no finding that that rose to the level of persecution. And so this was a separate incident. I'm not certain how ethnicity plays a role in any harm that he suffered or fears on account of his assistance of the Nigerians. Because not every crew tribe member assisted a Nigerian. No, it's not clear that he assisted the Nigerians on account of his ethnicity or that anybody was interested in harming him because he was an ethnically Kuru or Kron assistant to the Nigerians. And so in essence, the assistance to Nigerian claim is a political opinion or imputed political opinion claim that because he assisted the Nigerians, he might have had political opinion A or B. But that's certainly distinct from an ethnicity claim where rebels lined him and his family up and said, what ethnicity are you from? Are you Kuru or are you Kron? That's very separate from the suggestion that perhaps he had a political opinion because he assisted the Nigerians. And so in this way, there is a distinction to be drawn between the two different claims, only one of which was a basis for the past persecution finding. And one of which, that one, was a basis for the presumption which the board and the immigration judge concluded that DHS had rebutted. And so in sum, Your Honors, this court has explained that when there is a somewhat contradictory country conditions report, even if that is the case, the board is to bring its expertise to bear in such a case, and that's what the board did here. And for that reason, the respondent asked that this court deny the petition for review. No further questions, I would submit. Thank you very much. Thank you. Your Honors, with all due respect, I would suggest that it's too fine and rather artificial distinction to say that, well, once he began collaborating with the Nigerians, that was a different ground of persecution. It's part of the same story. He was abused. He escaped. He sought protection from someone who could protect him. And because of his collaboration with the Nigerians, he was now regarded as a traitor. There's a clear causal connection between the initial persecution on account of ethnicity and the hostility that he brought down on himself by collaborating with the Nigerians. So I would submit to you that it's too fine and too artificial a distinction to treat those as separate claims, one of which fails because there's not ethnic violence anymore in Liberia, and the second one was, I gather counsel's argument, was waived because we didn't challenge the finding that the persecution was on account of ethnicity. It's just too artificial. Thank you. Thank you. The Court thanks counsel for their argument, and the case of Freeman v. Holder will be submitted. Thank you very much.
judges: O'scannlain, Bea, Christen